## In re INTERNATIONAL BUSINESS MACHINES CORPORATION, Petitioner.

### No. 1406, Docket 82–3037.

United States Court of Appeals, Second Circuit.

Argued June 17, 1982.

Decided Aug. 13, 1982.

Thomas D. Barr, New York City (Cravath, Swaine & Moore, New York City, of counsel), for petitioner I. B. M.

J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice, Washington, D. C. (Barry Grossman, Susan Herdina, Neil R. Ellis, Dept. of Justice, Washington, D. C., of counsel), for the United States of America.

David C. Vladeck, Washington, D. C. (Alan B. Morrison, Vladeck, Waldman, Elias & Engelhard, New York City, of counsel), for amicus curiae Public Citizen Litigation Group.

Grant W. Kelleher, Washington, D. C. (Worth Rowley, Raymond D. Watts, Neal L. Thomas, Rowley & Watts, Washington, D. C., of counsel), for amicus curiae Philip M. Stern.

Before MESKILL, NEWMAN and KEARSE, Circuit Judges.

MESKILL, Circuit Judge:

International Business Machines Corporation ("IBM") petitions pursuant to 28 U.S.C. § 1651[1] and Fed.R.App.P. 21[2] for a writ of mandamus directing Judge David N. Edelstein of the United States District Court for the Southern District of New York to "conduct no further proceedings of any kind whatsoever with respect to the parties and issues in the case of *United States v. International Business Machines Corp.*, 69 Civ. 200 [ (S.D.N.Y. filed January 17, 1969) ]," and to vacate certain orders he has entered "requiring the parties . . . to preserve documents." Petition at 45. Alternatively, IBM seeks for the second time an order from this Court directing Judge Edelstein to recuse himself from further proceedings. *See In re International Business Machines Corp.*, 618 F.2d 923 (2d Cir. 1980). IBM's petition raises novel issues regarding the application and scope of the Antitrust Pro-

cedures and Penalties Act, 15 U.S.C. § 16(b)–(h) ("Tunney Act"), as well as the propriety of the writ of mandamus. Before reaching these issues, we recount the events leading to IBM's petition.

## BACKGROUND

On January 17, 1969, the United States Department of Justice filed a complaint alleging that IBM had monopolized the market for general purpose electronic digital computer systems in violation of section 2 of the Sherman Act, 15 U.S.C. § 2 (1976). Almost thirteen years later, on January 8, 1982, the case appeared to come to an end with the filing of a stipulation of dismissal under Fed.R.Civ.P. 41(a)(1), which states in pertinent part:

Subject to the provisions of Rule 23(e), of Rule 66, and of any statute of the United States, an action may be dismissed by the plaintiff without order of court . . . (ii) by filing a stipulation of dismissal signed by all parties who have appeared in the action.

The stipulation, which was signed by counsel for IBM and by Assistant Attorney General William F. Baxter for the United States, provides:

WHEREAS, the Assistant Attorney General in charge of the Antitrust Division and his staff undertook a review of this case in June of 1981; and

WHEREAS, that review has included a study of the trial record and a series of meetings with counsel wherein each of the issues in the case was presented in writing and orally and discussed and analyzed at length; and

WHEREAS, that review has now been completed; and

1. 28 U.S.C. § 1651(a) provides: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

2. Fed.R.App.P. 21(a) states in pertinent part: Mandamus or Prohibition to a Judge or Judges; Petition for Writ; Service and Filing. Application for a writ of mandamus or of prohibition directed to a judge or judges shall be made by filing a petition therefor with the clerk of the court of appeals with proof of service on the respondent judge or judges and on all parties to the action in the trial court. The petition shall contain a statement of the facts necessary to an understanding of the issues presented by the application; a statement of the issues presented and of the relief sought; a statement of the reasons why the writ should issue; and copies of any order or opinion or parts of the record which may be essential to an understanding of the matters set forth in the petition.

WHEREAS, plaintiff has concluded that the case is without merit and should be dismissed and has so informed defendant

IT IS HEREBY STIPULATED AND AGREED that this case is dismissed without costs to either side.

The Justice Department's decision to abandon what had been one of the nation's longest antitrust suits followed an extensive review by Mr. Baxter from which he concluded that continued litigation would offer "little prospect of victory or meaningful recovery." In a memorandum explaining his decision to dismiss the suit, Mr. Baxter observed that even if the government prevailed at trial,[3] "the likelihood of success on appeal is small" in light of *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Mr. Baxter also stated that "even assuming that the government could prove IBM's liability, there is no assurance that appropriate relief could be obtained."

Judge Edelstein initially gave no indication that he questioned the effectiveness of the stipulation. At the January 8 hearing at which the stipulation was presented to the court, Judge Edelstein explained for the benefit of observers in the courtroom:

> The parties of this action have presented to the Court a stipulation of dismissal whereby they agree that this case is dismissed. Now, if you are wondering a little bit about that, let me call your attention to Rule 41(a)(1)(ii) of the Federal Rules of Civil Procedure which in effect states that when parties agree to drop a case the approval of the court is not required, nor is there any need to seek it.
>
> The Court under this rule has no control whatsoever over the actions of coun-

sel or the judgment they have exercised. The stipulation between the parties is not a judgment or order of the Court.

Notably, Judge Edelstein made no mention that the Tunney Act, which requires public disclosure and judicial scrutiny of the terms and potential impacts of "consent decrees," might apply to the stipulation.

Judge Edelstein's initial reaction, however, soon changed. In an article published on January 26, 1982 in *The Wall Street Journal*, he sharply criticized Mr. Baxter's decision to dismiss the case and called for the decision to "be scrutinized carefully." He further accused Mr. Baxter of having "[run] roughshod over the members of his own trial team." Then, at a hearing on February 8 addressed to certain "housekeeping matters," Judge Edelstein refused to sign several proposed orders presented jointly by the parties which would have allowed them to dispose of billions of pages of unused documents that had accumulated over the course of the litigation as a result of various pretrial orders.[4] Judge Edelstein stressed that "[i]t is especially important in cases of historical significance that the record remain intact for those who seek to inspect it." The documents sought to be destroyed, however, had neither been introduced into evidence nor referred to during the trial. Four days later, an affidavit by an IBM employee was filed with the court indicating that the retention of the documents under the pretrial orders was costing several million dollars each year. A second affidavit to the same effect was filed on February 17.

No further proceedings occurred until March 2, when Judge Edelstein, without prior notice to the parties of the issues to be discussed, conducted a hearing calling into question Mr. Baxter's role in the Justice

---

3. At the time the stipulation had been entered, both IBM and the government had completed their presentations of evidence and were due to submit proposed findings of fact.

4. The record indicates that Pretrial Order No. 1, which was entered on March 16, 1972, initially required the parties to preserve all documents "which relate in any way to electronic data processing or to any electronic data processing

product or service." The order was amended several times during the course of litigation to limit its scope, but has nevertheless required the parties to retain vast amounts of documents which would otherwise have been discarded by IBM in the normal course of business. Complete sets of the trial record will be retained by the court and by each party.

Department's decision to dismiss the action. After delaying the conference for approximately forty minutes to allow members of the press to arrive, Judge Edelstein entered into the record several letters which indicated that Mr. Baxter had served as a consultant to IBM during the early stages of a private antitrust suit brought by Memorex Corporation involving "generally similar" issues raised in this litigation. Judge Edelstein expressed his concern that Mr. Baxter had never publicly disclosed his prior representation and raised the possibility of a conflict of interest. At the same time, Judge Edelstein stated:

> [I]t is not the role of the Court at this point to review Mr. Baxter's conduct or his decisions. Rather, the appropriate bodies for that review are the Committees on the Judiciary of the Senate and House, the Department of Justice, the Office of Government Ethics, and professional committees of the bar.

While Judge Edelstein called for Mr. Baxter to disclose fully "a detailed statement of the dates and nature of services provided to IBM and the compensation received therefor, as well as any other information bearing on this subject," he reiterated his comments made at the January 8 hearing that the court was powerless to interfere with the decision to dismiss the suit:

> Earlier, I mentioned the appearance of impropriety. The Court, from the date it was informed of the dismissal of this case, has been concerned that the Department of Justice may not have acted in the best interests of the public. However, there was little the Court could do. By voluntarily dismissing the case the department and IBM circumvented judicial review and the procedural safeguards of the Tunney Act.
>
> As I stated at our last conference, the Tunney Act was adopted in large part as a check on prosecutorial discretion, and indeed, as a means to expose and prevent collusion. The sanction the Court has available in a Tunney Act review is the power to reject the settlement, thus requiring the Department of Justice to proceed in its prosecution of the action.

That action, however, is meaningless when the Department decides that the case is without merit and should not be prosecuted.

> That the safeguards of the Tunney Act do not apply does not end the Department of Justice's obligation to exercise independent judgment on behalf of the public. The public, after all, is the department's client. The people of the United States have a vital interest in this case. They have a right to know all the facts and how these facts were evaluated by their lawyer in making the decision for them. It is absolutely essential that the public not suspect that the decision of their lawyer was influenced by improper considerations. It is absolutely essential that the public believe that this case was resolved through a genuine adversary and not collusive relationship. Indeed, it is the adversary relationship which forms the basis of our legal system.

On March 19, Philip M. Stern, a "concerned" citizen of the District of Columbia, was granted leave to appear as *amicus curiae* "for the purpose of inviting the Court's attention" to two issues which, he alleged, questioned the effectiveness of the stipulation of dismissal: (1) whether the dismissal was legally ineffective because of the failure to comply with the procedures set forth in the Tunney Act; and (2) whether Mr. Baxter was disqualified from signing the stipulation because of possible conflicts of interest. Later that day, Judge Edelstein signed an order submitted by Stern requiring the government and IBM to show cause why the stipulation of dismissal should not be declared "ineffective and a nullity and should not be expunged from the record" on either of those grounds. The return date for the order to show cause was set for April 19. Mr. Baxter temporarily recused himself from further involvement in the proceeding on March 25. J. Paul McGrath, Assistant Attorney General in charge of the Civil Division, was appointed to replace Mr. Baxter in the interim.

On April 1, Public Citizen, a self-described nonprofit organization with a "long-

standing interest in the implementation and enforcement of the Tunney Act," notified the court and the parties that it would move at the April 19 hearing for leave to appear as *amicus curiae* in support of Stern's position on that question. Four days later, the government was granted a postponement until June 21 of the hearing on the issue of Mr. Baxter's possible conflict of interest to allow the Office of Professional Responsibility of the Justice Department to complete its investigation of the matter. The issue of the Tunney Act's applicability to the stipulation of dismissal was scheduled for a May 19 hearing.

On May 17, IBM charged that Judge Edelstein had demonstrated a clear bias against it and requested that he recuse himself from further participation in this action. IBM also submitted that the filing of the stipulation of dismissal had terminated the antitrust action and stripped the court of jurisdiction to entertain Stern's motions. At the commencement of the May 19 hearing, Judge Edelstein distributed a ten-page opinion rejecting IBM's jurisdictional challenge and denying its recusal request. Judge Edelstein declared that "[i]f the Tunney Act applies, then the court retains jurisdiction and the parties must comply with the Act's procedural safeguards." Accordingly, he concluded that the court had jurisdiction to determine whether the Tunney Act applies. He also concluded that "[t]he [recusal] request is utterly without merit and fails in all respects." Judge Edelstein found that the request was "untimely" and that it failed to allege a personal, extrajudicial bias as required by 28 U.S.C. §§ 144 & 455.[5] The hearing then proceeded to the issue of the Tunney Act's applicability. Following extensive argument by all parties, Judge Edelstein reserved decision, but gave no indication of when he might render a decision.

IBM then filed its petition in this Court for a writ of mandamus directing Judge Edelstein to cease further proceedings in this case or, alternatively, to recuse himself. We arranged for briefing on an expedited basis and scheduled a special hearing for June 17, 1981. Judge Edelstein filed an answer to the petition in which he set forth in detail his concerns regarding Tunney Act application and his grounds for rejecting the disqualification motion. His answer stated that he would not consider the housekeeping motions "until the conclusive termination of the case." We were informed by the parties during oral argument that a hearing in the district court concerning the disqualification of Mr. Baxter was still scheduled for June 21. We were also advised by Mr. McGrath that the Justice Department's Office of Professional Responsibility had concluded its investigation and had determined that no circumstances existed that disqualified Mr. Baxter from executing the stipulation of dismissal on behalf of the United States. Mr. McGrath indicated further that the Solicitor General of the United States, who is now Acting Attorney General with respect to this litigation,[6] has unqualifiedly supported the stipulation of dismissal and endorsed Mr. Baxter's authority to execute it. In light of the time constraints involved, following oral argument and a review of the record, we issued an order addressing the conflict of interest claim and reserved judgment on the Tunney Act claim. Our order provided, after reviewing the facts outlined above:

> Under these circumstances, we conclude that there is not even colorable jurisdiction in the District Court to pursue any inquiry concerning the merits of the conflict of interest claim. We have previously ruled that matters of attorney disqualification are to be inquired into by district courts only when the ground of disqualification is such as to pose a risk of

---

5. Judge Edelstein also held that IBM was barred by 28 U.S.C. § 144 from making a second request for recusal in the same proceeding.

6. The Solicitor General has been Acting Attorney General in this case because of decisions by the Attorney General, the Deputy Attorney General, Mr. Baxter, and the Associate Attorney General to disqualify themselves. *See* Brief for United States at 7 n.8.

tainting the trial. *Armstrong v. McAlpin*, 625 F.2d 433 (2d Cir. 1980) (*en banc*), *vacated on other grounds and remanded*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981). The risk of trial taint that may arise when a party to litigation is represented by counsel formerly associated with an adverse party to the litigation is two-fold: the confidences of the party with whom the lawyer was formerly associated may be revealed and the party whom the lawyer currently represents may fail to receive his unqualified loyalty. *See Board of Education v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979). In this case, IBM, by entering into the stipulation and urging that its effectiveness be honored, has manifested its view that Mr. Baxter's representation of the United States poses no risk of revealing any confidences of IBM. The United States, acting by its highest-ranking legal officer authorized to act with respect to this case, has represented that it is entirely satisfied with its representation by Assistant Attorney General Baxter in entering into the January 8 stipulation. In such circumstances, there is no appropriate action to be taken in *U. S. v. IBM* by the District Court with respect to the conflict of interest claim. We express no view as to the merits of that claim. Accordingly, we conclude that a writ of mandamus shall issue directing Judge Edelstein to cease any further inquiry with respect to the conflict of interest claim.

The only other matter being considered by the District Court concerning this case, aside from housekeeping matters mentioned below, is the applicability of the [Tunney Act] to the January 8 dismissal. Since there is no urgency attending our consideration of that aspect of the mandamus petition, we do not expedite our consideration of whether mandamus relief should be granted with respect to the [Tunney Act] claim. There is no contention that the District Court is asserting jurisdiction with respect to any other aspects of *U. S. v. IBM*, with the exception of consideration of what IBM characterizes as "housekeeping" details presented by the parties in connection with the termination of the litigation.

Therefore, it is hereby Ordered that a writ of mandamus shall issue to the Honorable David N. Edelstein, directing him to take no further action with respect to any aspect of *U. S. v. IBM* with two exceptions: (1) nothing in this Order shall prevent Judge Edelstein from determining the issue currently under advisement as to whether the [Tunney Act] is applicable to the January 8 stipulation of dismissal, and (2) nothing in this Order shall prevent Judge Edelstein from acting upon any request for relief sought in this litigation by either the United States or by IBM or by both parties acting jointly. We retain jurisdiction to consider the requests for mandamus relief not disposed of by this Order, and in due course will resolve all issues presented by the mandamus petition in a formal opinion.

Our opinion today considers whether a writ of mandamus should issue directing Judge Edelstein to take no further action with respect to the applicability of the Tunney Act to the stipulation of dismissal.

## DISCUSSION

### I. *Standard of Review*

#### A

IBM's petition, in essence, concerns the jurisdiction of the district court to determine its own jurisdiction. Yet the petition is much more, raising significant questions concerning the scope and propriety of mandamus relief. Additionally, we are faced with a particularly striking factual setting in which IBM's opponent for thirteen years, the Justice Department, has joined forces with IBM in urging this Court to issue a writ of mandamus. The opposing position is argued by the *amici* and by Judge Edelstein, who has submitted a sixty-six page brief supporting his claim of jurisdiction.

IBM's argument, simply put, is that the Tunney Act is so clearly inapplicable to the January 8 stipulation of dismissal that Judge Edelstein lacks jurisdiction even to

consider the question. Accordingly, IBM seeks mandamus from this Court directing Judge Edelstein to end his consideration of the matter. In rejecting IBM's jurisdictional challenge, Judge Edelstein ruled that the Tunney Act's applicability is a jurisdictional question which is within the court's province:

> If the Tunney Act applies, then the court retains jurisdiction and the parties must comply with the Act's procedural safeguards. If the Tunney Act does not apply, then the court lacks the jurisdiction to order the parties to comply with the Act's safeguards. Thus, the issue of the applicability of the Tunney Act is a jurisdictional question.

*United States v. International Business Machines Corp.*, 539 F.Supp. 473 at 476 (S.D.N.Y.1982).

■ We are familiar with what Judge Edelstein has termed "hornbook law," that the district court is vested with jurisdiction to determine its own jurisdiction. *Id.* at 475 (citing C. Wright, *Handbook of The Law of Federal Courts* 57–58 (3d ed. 1976)). This basic tenet of our legal system is a natural outgrowth of one of the Supreme Court's earliest holdings, that "[i]t is, emphatically, the province and duty of the judicial department, to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 176, 2 L.Ed. 60 (1803). Under these principles, we have no doubt that when confronted with the question of the Tunney Act's applicability, Judge Edelstein had jurisdiction to consider the question, just as he had jurisdiction at the outset to consider his jurisdiction to entertain the question of Mr. Baxter's possible conflict of interest. However, a court's power to determine its jurisdiction is surely not limitless; it, like all power, may be abused and usurped. Such an abuse resulted in our earlier order in this proceeding concerning Mr. Baxter. Our present task is to determine whether Judge Edelstein has similarly abused his power to consider the Tunney Act's applicability to the January 8 stipulation of dismissal.

## B

■ The parties, including Judge Edelstein, seem in accord that to establish an abuse of power in this case it must be demonstrated that the issue of the Tunney Act's applicability is "frivolous and not substantial." *United States v. United Mine Workers*, 330 U.S. 258, 293, 67 S.Ct. 677, 695, 91 L.Ed. 884 (1947). IBM and the United States therefore argue that the Act, both on its face and through its legislative history, leaves no doubt that it is inapplicable to stipulations of dismissal under Fed.R.Civ.P. 41(a)(1)(ii). *Amici* assert the diametrically opposed position, that the government cannot dismiss an antitrust suit without first satisfying the strictures of the Tunney Act. Judge Edelstein takes an intermediate position: while he concedes that the district "court cannot *prevent* the Department of Justice from dropping an antitrust case," Brief for Judge Edelstein at 25, he suggests that the stringent disclosure requirements and procedural safeguards of the Act may have to be satisfied "*before* the dismissal becomes effective," *id.* at 26. *Amici* and Judge Edelstein contend that their respective positions are at least "nonfrivolous and substantial" enough to withstand IBM's jurisdictional attack.

We believe that in framing the issues, the parties have adopted an incorrect standard. The "frivolous and not substantial" language was taken from the *Mine Workers* case, which involved a contempt citation, not a writ of mandamus. The defendants there had disobeyed a restraining order issued by the district court upon the grounds that the court lacked jurisdiction to issue the order. After the district court adjudged the defendants in contempt, they challenged the citation before the Supreme Court on the same jurisdictional grounds. In upholding the contempt citation, the Supreme Court ruled that a court injunction must "be obeyed by the parties until it is reversed by orderly and proper proceedings." 330 U.S. at 293, 67 S.Ct. at 695. However, the Court recognized that "a different result would follow were the question of jurisdiction *frivolous and not substantial.*" *Id.* (emphasis added). The *Mine*

*Workers* Court was therefore concerned with reenforcing the integrity of judicial orders and focused upon a party's obligation, except under extremely narrow circumstances, to obey such orders. In contrast, the present case does not involve a party's duty to obey an order of the court, but the circumstances in which mandamus may be an appropriate remedy to control the actions of a district court allegedly abusing its power. *Mine Workers* established a stringent limitation on a party's entitlement to resort to self-help when confronted with a court order; IBM, by seeking an order of this Court to vindicate its legal position, is pursuing the antithesis of self-help. Accordingly, we find that the "frivolous and not substantial" standard does not control our inquiry. Instead, we focus on the traditional standards for mandamus relief.

### C

 The standards governing mandamus relief have long been clear. As we recently summarized in *In re United States of America*, 680 F.2d 9 (2d Cir. 1982):

Initially, it is important to note that "mandamus cannot be utilized as a substitute for an appeal." *International Business Machines Corp. v. United States*, 480 F.2d 293, 298 (2d Cir. 1973) (*en banc*), *cert denied*, 416 U.S. 979, 980, 94 S.Ct. 2413, 40 L.Ed.2d 776 (1974); *see Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34–36, 101 S.Ct. 188, 189–191, 66 L.Ed.2d 193 (1980) (*per curiam*); *Schlagenhauf v. Holder*, 379 U.S. 104, 110, 85 S.Ct. 234, 238, 13 L.Ed.2d 152 (1964). Mandamus is an extraordinary remedy, the "touchstones" of which are "usurpation of power, clear abuse of discretion and the presence of an issue of first impression," *American Express Warehousing Ltd. v. Transamerica Insurance Co.*, 380 F.2d 277, 283 (2d Cir. 1967); it "has traditionally been used in the federal courts only 'to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so.'" *Will v. United States*, 389 U.S. 90, 95, 88

S.Ct. 269, 273, 19 L.Ed.2d 305 (1967) (quoting *Roche v. Evaporated Milk Association*, 319 U.S. 21, 26, 63 S.Ct. 938, 941, 87 L.Ed. 1185 (1943)). Writs of mandamus are generally granted only in cases presenting exceptional circumstances or of extraordinary significance, *see, e.g., Schlagenhauf v. Holder, supra*, 379 U.S. at 110–11, 85 S.Ct. at 238–239; *In re Attorney General, supra*, 596 F.2d at 63–64; *Investment Properties International, Ltd. v. IOS, Ltd.*, 459 F.2d 705, 708 (2d Cir. 1972); *United States v. United States District Court*, 444 F.2d 651, 655–56 (6th Cir. 1971), *aff'd on other grounds*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), and this Court has noted a special reluctance to grant such a remedy, *In re Attorney General, supra*, 596 F.2d at 63. "[M]ere error even gross error in a particular case, as distinguished from a calculated and repeated disregard of governing rules, does not suffice to support issuance of the writ." *United States v. DiStefano*, 464 F.2d 845, 850 (2d Cir. 1972).

*Id.* at 12. IBM's burden, therefore, is not necessarily to demonstrate that the issue of the Tunney Act's applicability is "frivolous and not substantial," but to establish that in his course of considering the issue Judge Edelstein has usurped power and clearly abused his discretion. While the district court's serious consideration of a nonfrivolous issue is normally appropriate, the nature of the question, the posture of the case in which it is considered, and the practical consequences of a lengthy consideration may lead to the conclusion that the consideration is a clear abuse of the court's discretion.

 We begin with the recognition that this is an extraordinary case. It has been one of the longest antitrust cases since the enactment of the Sherman Act, and involves one of the nation's largest industrial concerns. The parties in this litigation have seen four changes of Administration with corresponding shifts in civil antitrust policies. With these changes have come dozens of new attorneys. The length of the pro-

ceedings is particularly significant because of developments in the industry since the commencement of the action which, practically speaking, have rendered many of the underlying products commercially outmoded. The case also reaches us in a unique context in that both parties seek dismissal. In light of the underlying issue of first impression, *i.e.*, whether the Tunney Act applies to Rule 41(a)(1) stipulations of dismissal, the unique nature of this case, the enormous sums of money being expended by the parties in compliance with orders for document retention which the district court will not even consider modifying until it has decided the Tunney Act question, and the length of the proceedings, we have the "extraordinary significance" required to make mandamus an appropriate consideration. *See In re Attorney General*, 596 F.2d 58, 64 (2d Cir. 1979). Accordingly, we proceed to a review of IBM's claims.

## II. *The Tunney Act*

Essential to IBM's argument that Judge Edelstein has abused his jurisdiction is a firm conviction that the Tunney Act does not apply to the January 8 stipulation of dismissal. Our inquiry must therefore commence with an analysis of the Act itself.

The Tunney Act was enacted in 1974 in response to the growing number of settlements by consent decree in actions filed by the Antitrust Division of the Department of Justice.[7] Recognizing that "[t]he entry of a consent decree is a judicial act which requires the approval of a United States district court," S.Rep.No.93–298, 93rd Cong., 1st Sess. 5 (1973), and fearing that courts

were engaging in "judicial rubber stamping" of proposals submitted by the Justice Department, H.R.Rep.No.93–1463, 93rd Cong., 2d Sess. 8 (1974), *reprinted in* [1974] U.S.Code Cong. & Ad.News 6535, 6538, Congress determined that judicial approval should be based upon specific criteria to ensure that the settlement terms would serve the public interest.[8] Congress also recognized that "antitrust violators wield great influence and economic power," S.Rep.No.93–298, 93rd Cong., 1st Sess. 5 (1973), and felt that "additional comment and response" from the public would alleviate much of the "significant pressure" violators could often "bring ... to bear on government, and even on the courts, in connection with handling of consent decrees," *id.* Prior to the Act, the public was advised of the entry of a consent decree in an antitrust action only on the actual date of filing by means of a press release. The release invited public comments to the court and to the Department of Justice before the decree was entered as a judgment of the court thirty days later. This procedure, however, was followed only as a matter of internal policy of the Department of Justice. The Act strives to elicit greater public input by requiring advance publication in the Federal Register of the terms of the Department's proposed consent decree and a "competitive impact statement" summarizing the likely effects of the decree, and by expanding the thirty-day public comment period to sixty days. 15 U.S.C. § 16(b).

In addressing the contention that the Act's strictures also apply to stipulations of

---

**7.** The Senate and House Reports indicate that on average from 1955 through the Act's enactment, approximately 80% of all antitrust complaints filed by the Department of Justice were settled prior to trial. H.R.Rep.No.93–1463, 93rd Cong., 2d Sess. 6 (1974), *reprinted in* [1974] U.S.Code Cong. & Ad.News 6535, 6536; S.Rep.No.93–298, 93rd Cong., 1st Sess. 5 (1973).

**8.** Section 2(e) of the Act provides:

Before entering any consent judgment proposed by the United States under this section, the court shall determine that the entry of such judgment is in the public interest.

For the purpose of such determination, the court may consider—

(1) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, and any other considerations bearing upon the adequacy of such judgment;

(2) the impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

dismissal entered pursuant to Fed.R.Civ.P. 41(a)(1), we must of course begin with "the language of the statute itself." *Consumer Product Safety Commission v. GTE Sylvania,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The Act by its express terms applies only to "[a]ny proposal for a *consent judgment* submitted by the United States for entry in any civil proceeding brought by or on behalf of the United States under the antitrust laws." 15 U.S.C. § 16(b) (emphasis added).

Nowhere does the Act indicate that its provisions also apply to stipulations of dismissal. The absence of such an indication is highlighted by the observation that Rule 41 had existed in its present form for almost thirty years prior to the Tunney Act's enactment. Congress was surely aware of Rule 41(a)(1)'s clear statement that a voluntary stipulation of dismissal requires no "order of court." We are particularly skeptical of the possibility that Congress provided *sub silentio* for the Act to apply to Rule 41(a)(1) stipulations of dismissal because the Act establishes an exception to the general rule that district courts need not subject consent decrees to a public interest litmus test. We are reluctant to broaden such a narrow exception to a long-standing rule without a clear indication of legislative intent. *Amici* argue that such an indication can be found in the Act's legislative history. That history totally contradicts the claim. An earlier bill introduced by Senator Bayh would have adopted a more expansive scope than the Tunney Act by subjecting "any proposed consent judgment or decree *or other settlement*" to judicial approval. S.1088, 93rd Cong., 1st Sess., 119 Cong.Rec. 6446 (1973) (emphasis added). Congress' ultimate decision to reject this broader language "strongly militates against a judgment that Congress intended a result that it expressly declined to enact." *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 200, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974).

Moreover, neither the House nor Senate report contains a single reference to Rule 41 or to stipulations of dismissal. That the Act is addressed expressly and exclusively to consent decrees is made clear by the House Report's unequivocal statement of purpose:

> Given the high rate of settlement in public antitrust cases, it is imperative that the integrity of and public confidence in procedures *relating to settlements via consent decree procedures* be assured. The bill seeks precisely to accomplish this objective and *focuses on the various stages of consent decree procedures,* including that process by which proposed settlements are entered as a court decree by judicial action.

H.R.Rep.No.93–1463, 93rd Cong., 2d Sess. 6 (1974), *reprinted in* [1974] U.S.Code Cong. & Ad.News 6535, 6536 (emphasis added).

The language of the Act and the Congressional reports are alone sufficient to dispel any notion that the Act applies to Rule 41(a)(1) dismissals. Yet, in addition, the Committee Hearings and Congressional debates compel the identical conclusion. The Act's sponsor, Senator Tunney, emphatically indicated in his opening remarks at the Senate Hearings that the Act's sole focus is on consent decrees:

> Specifically, our legislation will bring the consent decree process into the full light of day and will increase penalties for offenders. It will make our courts an independent force rather than a rubber stamp in reviewing consent decrees, and it will assure that the courtroom rather than the backroom becomes the final arbiter in antitrust enforcement.
>
> . . . *[The Act] focuses on the process by which antitrust suits are settled and consent judgments entered* by providing specific standards and procedures to assure that the decision to settle and the settlement itself are in fact in the public interest.

*The Antitrust Procedures and Penalties Act: Hearings on S. 782 and S. 1088 before the Subcommittee on Antitrust and Monopoly of the Committee on the Judiciary,* 93rd Cong., 1st Sess. (1973) ("*Senate Hearings*") (emphasis added). In the three days of Senate Hearings in which thirteen witnesses testified, not once was the possibility

mentioned that the Act might also apply to Rule 41(a)(1) dismissals. Senator Tunney's comments at the House hearings are even more pointed that voluntary dismissals are not within the Act's scope:

Mr. Hutchinson. Well, all right.

. . . .

I have only one other question, Senator, that I want to put to you.

Suppose that a court should determine that the consent judgment proposed by the United States isn't in the public interest, and they refuse to enter that decree. Then what alternative is left to the parties in the case? Is it necessary to try the case?

Mr. Tunney. Well, I would say there are two alternatives. They could try to work out a new agreement which would meet with the judge's approval or proceed with the litigation.

Mr. Hutchinson. Well, in other words, they could start anew and try to work out something else?

Mr. Tunney. Yes, absolutely.

Mr. Hutchinson. Would any kind of a consent decree need to have the court's approval?

Mr. Tunney. Right.

Mr. Hutchinson. Would any kind of agreement made outside the court privately stand?

Mr. Tunney. Well, I certainly do not think so. *I suppose the Justice Department could drop the suit. That would be a third alternative.* Otherwise the Justice Department could proceed with the litigation or come in with a new consent [decree] and attempt to get the judge's approval of that decree. There could not be, as I understand the law, and as I understand this litigation, a private agreement that would not involve a ratification by the court.

*Consent Decree Bills: Hearings on H.R. 9203, H.R.9947 and S.782 Before the Sub-*

*committee on Monopolies and Commercial Law of the Committee on the Judiciary,* 93rd Cong., 1st Sess. 43 (1973) (*"House Hearings"*) (emphasis supplied). The unmistakable import of Senator Tunney's remarks is that the Justice Department's decision to dismiss a suit is an *alternative* to proceeding with litigation or entering a consent decree. As such, it is not within the Act's scope. Remarks by other witnesses are to the same effect. *See, e.g., Senate Hearings* at 76 (Statement of James C. Campbell) ("The third possible outcome of judicial disapproval of the decree is that the defendant refuses to re-enter consent negotiations and the government declines to prosecute further."); *House Hearings* at 176 (Statement of George D. Reycraft) ("The only way I know of to get rid of [antitrust cases] is that you try them, settle them by consent decree, or you dismiss them.").

 In addition to the clear and indisputable legislative history, which compels the conclusion that the Act was not intended to apply to stipulations of dismissal, we perceive possible constitutional issues arising from the position *amici* endorse. The district court's involvement in the executive branch's decision to abandon litigation might impinge upon the doctrine of separation of powers. Judicial approval of consent decrees under the Act is, analytically, an entirely distinct proposition because the decree is entered as the court's judgment. We see no need to resolve these and other issues of constitutional dimension [9] because we construe the statute simply on the basis of its language and legislative history to exclude from its scope Rule 41(a)(1) dismissals.

Finally, *amicus* Public Citizen points to several antitrust actions in which it asserts that district courts have found the Act applicable to Rule 41(a) dismissals. *See United States v. Motor Vehicle Manufacturers*

**9.** For example, the government argued that once the United States exercises its prosecutorial discretion to dismiss a case, a justiciable controversy under Article III of the Constitution no longer exists. Brief for United States at 19.

*Association*, No. C.V. 69–075–JWC (C.D.Cal. filed Nov. 24, 1969); *United States v. American Telephone and Telegraph Co.*, No. 74–1698 (D.D.C. Jan. 12, 1982). We express no opinion on the actions taken by these courts other than to observe that both cases involved settlements of antitrust actions and, at least to some extent, entry of consent decrees. They are therefore each distinguishable from the present case. In a third case cited by Public Citizen, *United States v. Mercedes-Benz of North America*, No. C–79–2144 MHP (N.D.Cal. filed Aug. 15, 1979), the court apparently ordered the parties, *sua sponte*, to brief the issue of whether the Act applies to Rule 41(a)(1)(ii) dismissals. That court has yet to render its decision. We can only state that should the court conclude that the Act does apply, we would emphatically disagree.

■ In conclusion, we interpret the essence of *amici's* position to be that despite the compelling evidence that Congress did not provide for the Act to encompass stipulations of dismissal, the Act should be so applied. *Amici* as well as Judge Edelstein refer to the Act's "remedial" nature, and argue that many of the considerations which prompted Congress to legislate in the area of consent decrees are also present where dismissals are involved. While this may be true, we are powerless to amend an Act of Congress to provide what litigants desire; we may only order enforced what an Act lawfully provides. And absent some indication that Congress intended the Tunney Act to apply to dismissals, we must conclude that it does not apply.

### III. *Mandamus*

■ Our conclusion that the Tunney Act does not apply to the stipulation of dismissal in this case is not alone dispositive of IBM's petition for mandamus. Were we to issue a writ simply on the basis of our conclusion on the legal issue, we would violate the fundamental rule that mandamus may not be used "as a substitute for an appeal." *International Business Machines Corp. v. United States*, 480 F.2d 293, 298 (2d Cir. 1973) (*en banc*), *cert. denied*, 416 U.S. 979, 980, 94 S.Ct. 2413, 40 L.Ed.2d 776 (1974). Our "special reluctance" to grant mandamus, *see In re United States of America*, 680 F.2d at 12, is particularly acute in this instance because the district court has yet to rule on the legal issue. Nevertheless, we believe that the district court, even without ruling on the merits of the Tunney Act claim, has evinced a "usurpation of power" and a "clear abuse of discretion," *American Express Warehousing, Ltd. v. Transamerica Insurance Co.*, 380 F.2d 277, 283 (2d Cir. 1967). Moreover, we consider this case, which has run its course for thirteen years, replete with exceptional and compelling circumstances which require us to grant the requested relief.

A district court's power to determine jurisdictional questions, as we have already noted, is not limitless. The stipulation of dismissal in this case was presented to Judge Edelstein on January 8. He did not express his concern regarding the Tunney Act until mid-March. And, although he conducted a hearing on the issue on May 19, almost three months later he has yet to render a decision. While we do not criticize Judge Edelstein for considering the question at the outset, we think he has clearly abused his power by taking such a substantial amount of time to resolve what we have shown to be a clear-cut issue. He has been presented repeatedly with several factors which emphasize the importance of a prompt disposition of this matter and of the litigation. Foremost is that the parties are expending enormous sums of money—approximately $100,000 per week—to store superfluous documents pursuant to pretrial orders which Judge Edelstein refuses to vacate pending his decision, *see* note 4, *supra*. IBM has already incurred over $2 million in storage costs since the January 8 stipulation was presented to Judge Edelstein. As we have shown, a review of the Tunney Act and its legislative history indicates the Act's inapplicability to the stipula-

tion of dismissal. Similarly, we held earlier that the court lacked even "colorable jurisdiction" to consider Mr. Baxter's alleged conflict of interest. Yet, Judge Edelstein has conducted lengthy hearings and requested in depth briefing on these issues. In sum, Judge Edelstein has abused his power by continuing a lawsuit which the parties have sought eagerly to dismiss.

Under these circumstances, we find that a writ of mandamus is appropriate. The paramount concern of the parties is to bring this litigation to a swift completion. Having disposed of the two issues presented by Stern to the district court, we see no reason why their concern should not be satisfied. As such, a writ will "afford an expeditious and effective means of confining the inferior court to a lawful exercise of its prescribed jurisdiction." *Ex parte Republic of Peru*, 318 U.S. 578, 583, 63 S.Ct. 793, 796, 87 L.Ed. 1014 (1943).

Therefore, it is hereby Ordered that a writ of mandamus shall issue to the Honorable David N. Edelstein, directing him (1) to cease his consideration of whether the parties must comply with the Tunney Act before their stipulation of dismissal may become effective; and (2) to dispose promptly of any matters presented by the parties necessary to effectuate the conclusion of this litigation, especially with respect to the needless storage of documents.[10]

**10.** In light of our conclusion that a writ of mandamus should issue, we see no need to address IBM's alternative claim that Judge Edelstein should be ordered to recuse himself from further proceedings. We believe the sole remaining matters for disposition involve "housekeeping" matters. We have no reason to believe that Judge Edelstein will fail to dispose of these matters promptly in accordance with our instructions herein.